AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)          ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

| LODGED |
| :---: |
| CLERK, U.S. DISTRICT COURT |
| **12/9/25** |
| CENTRAL DISTRICT OF CALIFORNIA |
| BY: _____ MRV _____ DEPUTY |

| FILED |
| :---: |
| CLERK, U.S. DISTRICT COURT |
| December 9, 2025 |
| **CENTRAL DISTRICT OF CALIFORNIA** |
| BY: _____ CLD _____ DEPUTY |

United States of America,

v.

JUAN HERRERA-HERNANDEZ,

Defendant.

Case No.  2:25-mj-07671-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of November 5, 2024 through November 20, 2024, in the county of Los Angeles in the

Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
| --- | --- |
| 18 U.S.C. § 2251(a), (e) | Production of Child Pornography |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*/s/ Chelsea Malone*
*Complainant's signature*

_____
Chelsea Malone, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:  December 9, 2025

_____
*Judge's signature*

City and state:  Los Angeles, California

Hon. Jacqueline Chooljian, U.S. Magistrate Judge
*Printed name and title*

AUSA: Chelsea Norell, ext. 2624

**AFFIDAVIT**

I, Chelsea Malone, being duly sworn, declare and state as follows:

## I.   PURPOSE OF AFFIDAVIT

1.    I make this affidavit in support of a criminal complaint against JUAN HERRERA-HERNANDEZ ("HERRERA-HERNANDEZ", or SUBJECT), date of birth 06/02/2006, for violations of 18 U.S.C. § 2251(a),(e) (Production of Child Pornography) (the "SUBJECT OFFENSE"), for production of child pornography of Minor Victim 1, as defined below.

2.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and search warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II.   INTRODUCTION

3.    I am a Special Agent with the FBI and have been so employed since April 2022. As a Special Agent, I have conducted and participated in many investigations into criminal activity. I have executed and participated in the execution of search warrants and arrest warrants, and I have seized evidence of

violations of federal and state law. In my current position, I investigate the sexual exploitation of children in the Central District of California and associated violations of federal law.

4.    I have received training in the investigation and prosecution of child pornography and child exploitation offenses. Through my training and experience, I am familiar with the methods used by people who commit offenses involving the sexual exploitation of children. My training and experience have given me an understanding of how people who commit offenses relating to the sexual exploitation of children use the Internet and digital devices to facilitate, commit, and conceal evidence of those offenses.

## III. BACKGROUND ON CHILD EXPLOITATION OFFENSES, COMPUTERS, THE INTERNET, AND DEFINITION OF TERMS

5.    In this affidavit, the terms "minor," "sexually explicit conduct," "visual depiction," "producing," and "child pornography" are defined as set forth in 18 U.S.C. § 2256. The term "computer" is defined as set forth in 18 U.S.C. § 1030(e)(1).

6.    Based upon my training and experience in the investigation of child pornography, and information related to me by other law enforcement officers involved in the investigation of child pornography, I know the following information about the use of computers with child pornography:

a.    Computers and Child Pornography.  Computers and computer technology have revolutionized the way in which child pornography is produced, distributed, and utilized.  Child

2

pornographers can now produce both still and moving images directly from a common video camera and can convert these images into computer-readable formats. The use of digital technology has enabled child pornographers to electronically receive, distribute, and possess large numbers of child exploitation images and videos with other Internet users worldwide.

b. File Storage. Computer users can choose their method of storing files: either on a computer's hard drive, an external hard drive, a memory card, a USB thumb drive, a smart phone or other digital media device, etc. (i.e., "locally") or on virtual servers accessible from any digital device with an Internet connection (i.e., "cloud storage"). Computer users frequently transfer files from one location to another, such as from a phone to a computer or from cloud storage to an external hard drive. Computer users also often create "backup," or duplicate, copies of their files. In this way, digital child pornography is extremely mobile and such digital files are easily reproduced and transported. For example, with the click of a button, images and videos containing child pornography can be put onto external hard drives small enough to fit onto a keychain. Just as easily, these files can be copied onto compact disks and/or stored on mobile digital devices, such as smart phones and tablets. Furthermore, even if the actual child pornography files are stored on a "cloud," files stored in this manner can only be accessed via a digital device. Therefore, viewing this child pornography would require a computer, smartphone, tablet, or some other digital device that allows the

user to access and view files on the Internet.

       c.   Internet.  The term "Internet" is defined as the worldwide network of computers -- a noncommercial, self-governing network devoted mostly to communication and research with roughly 500 million users worldwide.  The Internet is not an online service and has no real central hub.  It is a collection of tens of thousands of computer networks, online services, and single user components.  In order to access the Internet, an individual computer user must use an access provider, such as a university, employer, or commercial Internet Service Provider ("ISP"), which operates a host computer with direct access to the Internet.

       d.   Internet Service Providers.  Individuals and businesses obtain access to the Internet through ISPs.  ISPs provide their customers with access to the Internet using telephone or other telecommunications lines; provide Internet e-mail accounts that allow users to communicate with other Internet users by sending and receiving electronic messages through the ISPs' servers; remotely store electronic files on their customer's behalf; and may provide other services unique to each particular ISP.  ISPs maintain records pertaining to the individuals or businesses that have subscriber accounts with them.  Those records often include identifying and billing information, account access information in the form of log files, e-mail transaction information, posting information, account application information, and other information both in computer data and written record format.

e.    IP Addresses.   An Internet Protocol address ("IP Address") is a unique numeric address used to connect to the Internet.   An IPv4 IP Address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). In simple terms, one computer in a home may connect directly to the Internet with an IP Address assigned by an ISP.   What is now more typical is that one home may connect to the Internet using multiple digital devices simultaneously, including laptops, tablets, smart phones, smart televisions, and gaming systems, by way of example.   Because the home subscriber typically only has one Internet connection and is only assigned one IP Address at a time by their ISP, multiple devices in a home are connected to the Internet via a router or hub.   Internet activity from every device attached to the router or hub is utilizing the same external IP Address assigned by the ISP.   The router or hub "routes" Internet traffic so that it reaches the proper device. Most ISPs control a range of IP Addresses.   The IP Address for a user may be relatively static, meaning it is assigned to the same subscriber for long periods of time, or dynamic, meaning that the IP Address is only assigned for the duration of that online session.   Most ISPs maintain records of which subscriber was assigned which IP Address during an online session.

f.    The following definitions:

i.    "Chat," as used herein, refers to any kind of text communication over the Internet that is transmitted in real-time from sender to receiver. Chat messages are generally short in order to enable other participants to respond quickly

and in a format that resembles an oral conversation. This feature distinguishes chatting from other text-based online communications such as Internet forums and email.

ii.  "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not necessarily obscene or do not necessarily depict minors engaging in sexually explicit conduct.

iii. "Child pornography," as defined in 18 U.S.C. § 2256(8), is any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical or other means, of sexually explicit conduct, where: (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct; (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct; or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

iv.  "Cloud-based storage," as used herein, is a form of digital data storage in which the digital data is stored on remote servers hosted by a third party (as opposed to, for example, on a user's computer or other local storage device) and is made available to users over a network, typically the Internet. Users of such a service can share links and associated passwords to their stored files with other traders of child

pornography in order to grant access to their collections. Such services allow individuals to easily access these files through a wide variety of electronic devices such as desktop and laptop computers, mobile phones, and tablets, anywhere and at any time. An individual with the password to a file stored on a cloud-based service does not need to be a user of the service to access the file. Access is typically free and readily available to anyone who has an Internet connection.

v.    "Computer," as used herein, refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device" and includes smartphones, other mobile phones, and other mobile devices. See 18 U.S.C. § 1030(e)(1).

vi. "Minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of eighteen years.

vii. "Mobile applications," as used herein, are small, specialized programs downloaded onto mobile devices that enable users to perform a variety of functions, including engaging in online chat, reading a book, or playing a.

viii.    "Sexually explicit conduct," as defined in 18 U.S.C. § 2256(2), means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or

7

masochistic abuse; or (e) lascivious exhibition of the anus, genitals, or pubic area of any person.

ix.  "Visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disc or other electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

x.  A "Website" consists of textual pages of information and associated graphic images. The textual information is stored in a specific format known as Hyper-Text Mark-up Language (HTML) and is transmitted from web servers to various web clients via Hyper-Text Transport Protocol (HTTP).

## IV.  <u>SUMMARY OF PROBABLE CAUSE</u>

7.  As set forth in greater detail below, between approximately November 2024, through July 2025, via iMessage and other social media platforms, HERRERA-HERNANDEZ coerced, induced, and enticed at least two minors to create and send him child sexual abuse materials ("CSAM"). At HERRERA-HERNANDEZ's urging, Minor Victim 1 ("MV1"), a then 13-year-old girl, produced and sent HERRERA-HERNANDEZ at least four images of CSAM, and Minor Victim 2 ("MV2"), a then 13-year-old girl, produced and sent HERRERA-HERNANDEZ two images of CSAM. HERRERA-HERNANDEZ also attempted to coerce and induce Minor Victim 3 ("MV3"), a then 15-year-old girl, to produce CSAM. As such, there is probable cause to believe that HERRERA-HERNANDEZ committed the SUBJECT OFFENSE.

## V.    STATEMENT OF PROBABLE CAUSE

8.    Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

### A.    THE FBI EXECUTED SEARCH WARRANTS AT HERRERA-HERNANDEZ'S RESIDENCE

9.    The investigation into HERRERA-HERNANDEZ was initiated by the FBI San Antonio Office, Austin Resident Agency in December 2024. On or about December 4, 2024, the parents of MV1, a then 13-year-old female, contacted the FBI in Austin, Texas to report that their daughter had sent CSAM to a then-unknown male, later identified as HERRERA-HERNANDEZ, who was believed to be located in California. In May 2025, the investigation was transferred to me at the FBI Los Angeles Field Office, Lancaster Resident Agency.

10.    On July 18, 2025, I obtained a federal search warrant to search the person of JUAN HERRERA-HERNANDEZ and his premises, located at 38562 Dunmore Ave, Palmdale, CA 93550. The affidavit in support of the warrant, and one of the warrants, is attached as **Exhibit 1**.

11.    On July 22, 2025, the search warrants were executed and HERRERA-HERNANDEZ's personal cellphone, an iPhone 14, was seized. HERRERA-HERNANDEZ was also interviewed. HERRERA-HERNANDEZ was read his Miranda rights and was informed that he was not under arrest. The interview was surreptitiously

recorded. During the interview, HERRERA-HERNANDEZ provided the following information:

a.    HERRERA-HERNANDEZ met MV1 on Twitter in early 2024. HERRERA-HERNANDEZ believed that MV1 was 16 years old, lived in Texas, and was a transgender male.

b.    HERRERA-HERNANDEZ and MV1 began communicating via Twitter and their friendship developed into a relationship, which remained long-distance. At some point during their relationship, their conversations transitioned from Twitter to GroupMe due to MV1 not wanting his mom to catch them talking. HERRERA-HERNANDEZ and MV1 would typically communicate via GroupMe and iMessage. MV1's contact information is saved in HERRERA-HERNANDEZ's phone as "The Gay Boy".

c.    HERRERA-HERNANDEZ and MV1 sent explicit photos and videos to one another during the duration of their relationship, which was a mutual agreement.

d.    HERRERA-HERNANDEZ asked MV1 to send a photo of himself completely nude or of him touching himself to HERRERA-HERNANDEZ and MV1 obliged.

e.    HERRERA-HERNANDEZ never forced MV1 to do anything unless MV1 explicitly asked, as MV1 was into that type of thing.

f.    HERRERA-HERNANDEZ and MV1 never met and never had sex.

g.    During the interview, HERRERA-HERNANDEZ asked, "Did he lie about his age?", referring to MV1 and stating that MV1 told him that they were close in age. Specifically, MV1 said that he was 16 years old.

h.    HERRERA-HERNANDEZ acknowledged that at some point, once he turned 18 years old, he was aware that MV1 was still a minor, yet continued to engage in a relationship with him.

**B.    CELLPHONE EVIDENCE CONFIRMS HERRERA-HERNANDEZ EXPLOITED MV1**

12.    On October 28, 2025, I completed a review of HERRERA-HERNANDEZ's cellphone, obtained pursuant to the federal search warrant executed at the residence of JUAN HERRERA-HERNANDEZ on July 22, 2025.

13.    I observed messages and CSAM from MV1, in addition to observing messages with several other suspected minor victims. Regarding MV1, I observed the following:

a.    On or about November 5, 2024, HERRERA-HERNANDEZ messaged MV1, "TAKE OFF PUPPY CLOTHES :3" and "I wanna watch :3", and "Please hurry master is hard." In response, MV1 sent HERRERA-HERNANDEZ video file IMG_1913, which was an approximately 50 second video that depicted MV1 clothed, then undressing and exposing their genitalia and breasts. MV1's face was visible in the video. After MV1 sent the video, HERRERA-HERNANDEZ messaged MV1 "Gonna rape you :3" , "I love my twink

tape doll:, "come suck off boyfriend", "wanna watch boyfriend cum?", and "send a video of you begging on alll fours." MV1 responded that they were unable to send the video at the time.

b.    On or about November 7, 2024, HERRERA-HERNANDEZ told MV1 "Start touching yourself", "do one last thing for master then I let you eep. Ok", and "Strip down to your panties and give your self a wedgie and while saying how much you love me :4." In response, MV1 sent HERRERA-HERNANDEZ video "IMG_2096," an approximately 1 minute 3 second long video of MV1 rubbing their genitalia and inserted finger(s) into themself. MV1's face was visible in the video. HERRERA-HERNANDEZ told MV1 go to the bathroom, and when MV1 tried to decline, HERRERA-HERNANDEZ told MV1, "Pleaseeee so I can cum >_<" and "Shove a finger in your butt and film it too? :3."

c.    On or about November 16, 2024, HERRERA-HERNANDEZ asked, "Can I watch you get naked?" MV1 sent HERRERA-HERNANDEZ video "75347288110_3CB85304-7F05-464F-81C2-355C97BE1FF4," an approximately 30 second video that depicted MV1 removing their clothes with their breasts and vagina exposed. MV1's face was visible in the video. After MV1 sent the video, HERRERA-HERNANDEZ responded, "I love my rapeable twink husband."

d.    On or about November 20, 2024, HERRERA-HERNANDEZ showered MV1 with affection and told MV1 how much he loved MV1. During this conversation, MV1 said they had a "present" for HERRERA-HERNADEZ and sent video file "IMG_2745.mov," which was

approximately four minutes and 14 seconds and depicted MV1
masturbating, to include rubbing their genitalia and inserting
their fingers into their vagina. HERRERA-HERNANDEZ responded,
"Puppy needs a raping :3".

### C.    HERRERA-HERNANDEZ VICTIMIZED A SECOND MINOR

14.    During the review of HERRERA-HERNANDEZ's cellphone, I
also observed messages between HERRERA-HERNANDEZ and MV2, later
identified as a then-13-year-old girl. More specifically,
between approximately December 17 through December 18, 2024,
HERRERA-HERNANDEZ and MV2 exchanged in sexually explicit
messages.

15.    Specifically, on or about December 17, 2024, MV2 and
HERRERA-HERNANDEZ engaged in the following conversation:

> HERRERA-HERNANDEZ: Keep your clothes on I'm sorry
> being so hot
> MV2: I'll try 😵
>
> HERRERA-HERNANDEZ: maybe I should just take them off
> you myself;)
>
> MV2: Maybe u shoulddd
>
> HERRERA-HERNANDEZ: just felling around your body
> exploring you ,wouldn't that be nice
>
> MV2: Loved "I'd love to just pin you down on your back
> just po…"
>
> MV2: Omfg yes plz?

HERRERA-HERNANDEZ: do you have any kinks lol I wanna make finish happy as possible

MV2: Not rly that I could think of lol

HERRERA-HERNANDEZ: anything off limits tho

MV2: No not at all

HERRERA-HERNANDEZ: oh?👀 so if I wanted to I can just cum on your pretty slip it in you

MV2: Mhm 100%

HERRERA-HERNANDEZ: I'd love that just slip it in when you least expect it one hand on your neck the other just exploring you while i tell you what a good girl you are for taking my hard cock 😇

MV2: Omg that is so fucking hot

HERRERA-HERNANDEZ: I'd finish on your pretty face maybe a cream pie or two here and there

MV2: Mm fuck yeah

HERRERA-HERNANDEZ: god I'm so hard rn wishing I had a pretty girl named annistyn to finish in

MV2: Only if I were there 🙏😵🌀

HERRERA-HERNANDEZ: maybe you should tease me a little only if you want to

MV2: If I was there I would suck you untill you finish down my throat and I'd swallow every drop

14

HERRERA-HERNANDEZ: omg such a dirty girl I love it

MV2: I would suck you for so long I would Bradley get a breath in 😊

HERRERA-HERNANDEZ: I'd love to skull fuck that pretty mouth

MV2: Mmm mhm

HERRERA-HERNANDEZ: maybe you should show off something so I can get a better idea of what I'd love to do with you

MV2: Likeeeee

HERRERA-HERNANDEZ: let me see how pretty those tits are only if your comfortable showing

MV2: Mk

HERRERA-HERNANDEZ: Who's my good girl?


    a.    At that point in the conversation, MV2 sent HERRERA-HERNANDEZ a photo, filename IMG_9533, of her breasts. MV2's face was partially visible in the photo.

    b.    MV2 and HERRERA-HERNANDEZ the continued:

MV2: Me

HERRERA-HERNANDEZ: omg I wanna hold them while I just pile drive all 3 of your holes

HERRERA-HERNANDEZ: And those pretty soft lips I'd love to just rub my tip on t

HERRERA-HERNANDEZ: And those pretty soft lips I'd love to just rub my tip on them

MV2: Mmmm that would be so fucking good

c.    At that point, HERRERA-HERNANDEZ sent a photo of a penis. Based on the creation time and date, and the fact the photo appeared to have been taken on his iPhone 14, and then sent to MV2, leads me to believe the photo likely depicts HERRERA-HERNANDEZ's penis.

d.    MV2 and HERRERA-HERNANDEZ continued:

MV2: Fuck I wish it was in me 🙏

HERRERA-HERNANDEZ: id love to just slip in you fucking you so hard you can't think straight

MV2: Mm yes

e.    MV2 then sent HERRERA-HERNANDEZ video file name 60467B08-6126-425D-BD93-E8FABD9D1C35.MOV, an approximately seven second video that depicted MV2 rubbing her genitalia and inserting her fingers into her vagina.

f.    MV2 and HERRERA-HERNANDEZ continued:

HERRERA-HERNANDEZ: what position should I fuck your pretty ass in

HERRERA-HERNANDEZ: Omg your pussy so pretty and perfect it would look so good with my load dripping out 😵 🌀

16

MV2: Omg fk yeah

HERRERA-HERNANDEZ: who's my good girl

MV2: Meee

HERRERA-HERNANDEZ: That's sir to you sweetheart

MV2: Me sir

HERRERA-HERNANDEZ: I'm gonna fuck your brains out from all 3 holes fill them all up too

MV2: Mmm fk yes sir

HERRERA-HERNANDEZ: that's my good girl

MV2: Mhmm

HERRERA-HERNANDEZ: I accidentally finished without showing you 💔

MV2: Mmm I wish I saw

HERRERA-HERNANDEZ: I think I have an old video let me try and find it

HERRERA-HERNANDEZ: Don't mind my chopped face

HERRERA-HERNANDEZ: Or my breathing 😭

MV2: That so hot 😵🌀

HERRERA-HERNANDEZ: Wish you were here to clean it up I'd love to use your mouth to get rid of every last drop

MV2: M I bet you'd taste so good

HERRERA-HERNANDEZ: That is the most romantic thing I've ever read

HERRERA-HERNANDEZ: I bet your pussy tastes good too

MV2: Wish you could try itt

HERRERA-HERNANDEZ: I'd love that sm

MV2: Mhm me too

HERRERA-HERNANDEZ: You can run your fingers through my hair while I eat you out like it's my last meal 😇

MV2: Mmm fuck yeah

HERRERA-HERNANDEZ: I'd drink your cum or squirt like I've been in the Sahara desert and it's my first drink in a long time lol sorry for being so descriptive

MV2: That's literally the hottest thing g I have ever heard anyone say

HERRERA-HERNANDEZ: I will straight dive in

g.      On or about December 18, 2024, HERRERA-HERNANDEZ and MV2 engaged in the following conversation:

HERRERA-HERNANDEZ: I just have so many thoughts on how ima fuck all 3 holes not all a once well ima do that too but just being creative hehe

MV2: Shittttttt that's so hot

HERRERA-HERNANDEZ: Are you comfortable getting fucked analy sorry Ik that's such a blunt question but I just got know hehe

18

MV2: Mhm totally fine w it

HERRERA-HERNANDEZ: I'm gonna pin you against a wall heheh ill take your pants off you but your panties down just enough to expose your pretty ass spreed it a little explore it and find your Yk what hole and just slowly taking it and out while i degrade you a little bit hehe before just fucking it like it's a fleshlight I'll be holding your hands while I do it just from the back of the palms hehe

HERRERA-HERNANDEZ: sorry i didn't know what to call it unless you want me to be blunt again hehe

MV2: Fuck I'm so wet rn

HERRERA-HERNANDEZ: That's a good girl

HERRERA-HERNANDEZ: I wanna hear your sexual fantasies I wanna know what that dirty little mind comes up with

MV2: I need to feel your strong arms wrapped around me, holding me in place as you take me from behind. I want you to fill me completely, stretching me with every inch of your dk

HERRERA-HERNANDEZ: Omg yes please I'd fuck your pretty pussy and your asshole just like that I'm not gonna be gentle with you tho gonna fuck you like a human fleshlight 😇

19

> MV2: I want you so fuck me like I'm your toy that your
> simply using for pleasure and I was you to pound into
> me untill I'm sore
>
> HERRERA-HERNANDEZ: Omg your such a dirty slut I love
> it

h.    MV2 then sent HERRERA-HERNANDEZ video file IMG_9577.mov, an approximately 16 second video that depicted MV2 rubbing her genitalia.

16.    On or about November 20, 2025, with assistance from the FBI Atlanta Field Office, MV2 was identified as a then-13-year-old female. MV2's mother identified MV2 based on sanitized photographs from the CSAM MV2 sent to HERRERA-HERNANDEZ.

17.    On November 24, 2025, MV2 was interviewed via Child Adolescent Forensic Interview ("CAFI")[1] and provided the following information:

a.    MV2 positively identified the close-up genitalia images as being of her.

b.    MV2 recognized the nails in the photos and provided details on how she did the nails herself.

c.    MV2 identified the background in the topless photo as being her closet.

d.    MV2 identified the Subject as being a male residing in California.

---

[1] A "CAFI" is a forensic interview of a minor that is conducted by individuals who have specialized training in interviewing children and adolescents.

### D.   HERRERA-HERNANDEZ ATTEMPTED TO EXPLOIT A THIRD MINOR VICTIM

18.   While reviewing HERRERA-HERNANDEZ's cellphone, I observed messages between HERRERA-HERNANDEZ and MV3, later identified as a then-15-year-old girl. More specifically, between approximately May 29, 2025, and July 9, 2025, HERRERA-HERNANDEZ, Tiktok Username "Debbie Gallagher hate page", unique ID "7089495812271211563" communicated with MV3 via Tiktok. On or about May 29, 2025, via Tiktok, HERRERA-HRENANDEZ asked MV3 how old she was, to which they responded 15. HERRERA-HERNANDEZ told MV3 that he was 19. On or about July 4, 2025, MV3 messaged HERRERA-HERNANDEZ via Tiktok that they had a new a telephone number generated via the Textnow application. MV3 then engaged in messages via Textnow with HERRERA-HERNANDEZ between approximately July 4, 2025, and July 12, 2024.

19.   Between approximately July 4, 2025, and July 12, 2025, HERRERA-HERNANDEZ repeatedly attempted to entice, coerce, or induce MV3 to create CSAM:

        a.   On or about July 5, 2025, HERRERA-HERNANDEZ messaged MV3 "Good slut let me see my sexy little boy hehe".

        b.   On or about July 5, 2025, HERRERA-HERNANDEZ messaged MV3 "it would be so amazing if you snuck off somewhere and let me see that bush".

        c.   On or about July 6, 2025, HERRERA-HERNANDEZ messaged MV3 "Hmmm let me see your underwear:3".

        d.   On or about July 6, 2025, HERRERA-HERNANDEZ messaged MV3 "Awww ok hmmm let me see ur bush".

e.   On or about July 7, 2025, HERRERA-HERNANDEZ messaged MV3 "Yk what take your pants off" and "I wanna see your butt in underwear >:3"

f.   On or about July 7, 2025, via text message, MV3 and HERRERA-HERNANDEZ engaged in the following conversation:

HERRERA-HERNANDEZ: I'm gonna touch your boy parts till your sore

HERRERA-HERNANDEZ: Gonna choke you as I fuck your little boy pussy

MV3: almost got me turned on- .//.

HERRERA-HERNANDEZ: Your nothing more then a fleshlight that holds my old man cum your ass is for boyfriend load storage I'm not even gonna ask gonna pin you down and spread your butt apart and cum directly in your tight little boy asshole :3

MV3: that did it- .//.

HERRERA-HERNANDEZ: Maybe you should finger yourself now and let me watch

MV3: can't take any videos; that requires light and my sister decided she wanted to lay in my room:(

HERRERA-HERNANDEZ: Awwww why sad my sweet little boy?

MV3: bc my sister is annoying:<

HERRERA-HERNANDEZ: Hmmmm I can give you something to do in the bathroom:3

MV3: hmmm, maybeee

HERRERA-HERNANDEZ: Hmmm give me a 360 with no underwear on:3

MV3: I don't wanna go out there anymore, my grandparents are yelling... I have severe trauma with yelling

HERRERA-HERNANDEZ: Shhhh come here my sweet little boy daddy will protect his baby

MV3: I love you so much:(

HERRERA-HERNANDEZ: Who's daddy little boy?

MV3: I ammm HERRERA-HERNANDEZ: who wants there little boy parts touched so they sleep in there boyfriends arms?

MV3: I do, really bad

HERRERA-HERNANDEZ: I'll be nice and gentle so you fall asleep easy

HERRERA-HERNANDEZ: Who's daddy's little fleshlight and what hole is my favorite:3

MV3: I am, I'm yourss

HERRERA-HERNANDEZ: Do you know what hole is my favorite

MV3: noo, which one? :0

HERRERA-HERNANDEZ: Ur tight little asshole silly

g.   On or about July 7, 2025, via text message, MV3 and HERRERA-HERNANDEZ engaged in the following conversation:

HERRERA-HERNANDEZ: May I see ur butt :3

HERRERA-HERNANDEZ: Babyyyyyyuuy

MV3: OH- it didn't send

MV3: ugly me 🙃 ↕

MV3: [IMAGE NOT AVAILABLE]

HERRERA-HERNANDEZ: YUMMT MV3: nuh uh, no yum 🙃 ↕

MV3: [IMAGE NOT AVAILABLE]

HERRERA-HERNANDEZ: Can't wait to finger that butt

MV3: handsome man and maybe :3

HERRERA-HERNANDEZ: Noooo I'm going to finger it >:3 and ur handsome

MV3: I'm no handsome but yes fingering then 🙃 ↕

HERRERA-HERNANDEZ: Hehehe that's why I touch myself to your selfies>:3

HERRERA-HERNANDEZ: Awwwww okkkkk

HERRERA-HERNANDEZ: Mwah

MV3: I am gonna send it but I look ugly

HERRERA-HERNANDEZ: YIPPE

MV3: no handsome me, just ugly- 🙃 ↕

MV3: [IMAGE NOT AVAILABLE]

HERRERA-HERNANDEZ: AWWWWW MY SEXY LITTLE BOY

MV3: shshshsh >///<

HERRERA-HERNANDEZ: Give me a minute;3

MV3: Okieee

HERRERA-HERNANDEZ: [IMAGE NOT AVAILABLE]

MV3: damn- .///.

HERRERA-HERNANDEZ: There's a video but my cum messed it up 💔

MV3: it's alrighttt

HERRERA-HERNANDEZ: Are you happy now?:3

MV3: a bit, yes :0

HERRERA-HERNANDEZ: You owe me a fingering video later (only if you want to tho)

MV3: if I can I willll

HERRERA-HERNANDEZ: YIPPE

h.    On or about July 10, 2025, while discussing spicy foods, HERRERA-HERNANDEZ messaged MV3 "You also have to take ur clothes off" to which MV3 responded "I'm babysitting so I can't send a photo tho- .//." HERRERA-HERNANDEZ then messaged MV3 "NOOO".

i.    On or about July 12, 2025, HERRERA-HERNANDEZ messaged MV3 "May I see ur butt :4", to which MV3 responded no that they were babysitting.

20.    On or about November 21, 2025, with the assistance of the FBI Portland Field Office, MV3 was identified by her parents as a then-15-year-old female. MV3 was identified based on her Tiktok username and Textnow phone number.

21.    On or about December 2, 2025, MV3 was interviewed via CAFI and positively identified the accounts and messages exchanged with HERRERA-HERNANDEZ as being between her and an unknown male.

## VI.    CONCLUSION

22.    For all of the reasons described above, there is probable cause for the requested complaint and arrest warrant

//

against JUAN HERRERA-HERNANDEZ for violations of 18 U.S.C.

§ 2251(a),(e) (Production of Child Pornography), with respect to

MV1.


Attested to by the applicant in
accordance with the requirements of
Fed. R. Crim. P. 4.1 by telephone
on this ___9th___ day of
December, 2025.


_____
HONORABLE JACQUELINE CHOOLJIAN
UNITED STATES MAGISTRATE JUDGE

# Exhibit 1

AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
### for the
### Central District of California

| | |
|---|---|
| In the Matter of the Search of | ) |
| THE PREMISES LOCATED AT 38562 DUNMORE AVENUE, PALMDALE, CALIFORNIA 93550 (SUBJECT PREMISES), AS FURTHER DESCRIBED IN ATTACHMENT A-1 | ) ) ) ) Case No. 2:25-mj-04461 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property

*See Attachment A-1*

located in the Central District of California, there is now concealed

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 2251(a), (e) | Production of Child Pornography |
| 18 U.S.C. § 2422(b) | Coercion and Enticement |
| 18 U.S.C. § 2252A(a)(2) | Receipt of Child Pornography |
| 18 U.S.C. § 2252A(a)(5)(B) | Possession of Child Pornography |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of _____ days (*give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/
_____
*Applicant's signature*

Special Agent Chelsea Malone, FBI
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: 07/18/2025
_____

*Judge's signature*

City and state: Los Angeles, CA

Hon. A. Joel Richlin, U.S. Magistrate
_____
*Printed name and title*
Judge

AUSA: Wilson Park x5796

## <u>ATTACHMENT A-1</u>

<u>**PREMISES TO BE SEARCHED**</u>

The premises to be searched is located at 38562 Dunmore Avenue, Palmdale, California 93550 (the "SUJECT PREMISES").  The SUBJECT PREMISES is a one-story home with a tan colored exterior and brown roof.  The attached garage has a brown door.  The SUBJECT PREMISES includes any parking spaces, garages, storage space, and appurtenances that are associated with the SUBJECT PREMISES.  An image of the exterior SUBJECT PREMISES is copied below.



## ATTACHMENT B

**I. ITEMS TO BE SEIZED**

1.    The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. §§ 2251(a), (e) (production of child pornography), 18 U.S.C. § 2422(b) (coercion and enticement), 18 U.S.C. § 2252A(a)(2) (receipt of child pornography), and 18 U.S.C. § 2252A(a)(5)(B) (possession of child pornography) (the "Subject Offenses"), namely:

a.    Child pornography, as defined in 18 U.S.C. § 2256(8).

b.    Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that refer to child pornography, as defined in 18 U.S.C. § 2256(8), including but not limited to documents that refer to the possession, receipt, distribution, transmission, reproduction, viewing, sharing, purchase, downloading, production, shipment, order, requesting, trade, or transaction of any kind, involving child pornography.

c.    Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, and also including but not limited to financial records, tending to identify persons involved in the possession, receipt, distribution, transmission, reproduction, viewing, sharing,

purchase, downloading, production, shipment, order, requesting,

trade, or transaction of any kind, involving child pornography,

as defined in 18 U.S.C. § 2256.

      d.   Any records, documents, programs, applications,

or materials, including electronic mail and electronic messages,

that refer or relate to any production, receipt, shipment,

order, request, trade, purchase, transaction of any kind

involving the transmission through interstate commerce by any

means, including by computer, of any visual depiction of a minor

engaged in sexually explicit conduct, as defined in 18 U.S.C.

§ 2256.

      e.   Any records, documents, programs, applications,

or materials, including electronic mail and electronic messages,

identifying persons transmitting in interstate commerce,

including by computer, any visual depiction of a minor engaged

in sexually explicit conduct, as defined in 18 U.S.C. § 2256.

      f.   Any records, documents, programs, applications,

or materials, including electronic mail and electronic messages,

that identify any minor visually depicted while engaging in

sexually explicit conduct, as defined in 18 U.S.C. § 2256.

      g.   Any and all records, documents, programs,

applications, or materials which are sexually arousing to

individuals who are interested in minors, but which are not in

and of themselves obscene or which do not necessarily depict

iii

minors involved in sexually explicit conduct.  Such material is commonly known as "child erotica" and includes written materials dealing with child development, sex education, child pornography, sexual abuse of children, incest, child prostitution, missing children, investigative techniques of child exploitation, sexual disorders, pedophilia, nudist publications, diaries, and fantasy writings.

  h. Any records, documents, programs, applications, or materials identifying possible minor victims depicted in child pornography and/or minor victims of sexual abuse.

  i. Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, which pertain to accounts with any Internet Service Provider.

  j. Any records, documents, programs, applications, materials, or files relating to telephone number 661-618-9483.

  k. Any records, documents, programs, applications, materials, or files, including communications of any kind, relating to Minor Victim 1.

  l. Any records, documents, programs, applications, materials, or files relating to the deletion, uploading, and/or acquisition of victim files to include photographs, videos, e-mails, chat logs, or other files.

  m. Any digital device used to facilitate the above-listed violations and forensic copies thereof.

2.    Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

3.    With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

       i.    evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted;

       ii.    evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

       iii. evidence of the attachment of other devices;

       iv.    evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

       v.    evidence of the times the device was used;

       vi.    applications, programs, software, documentation, manuals, passwords, keys, and other access devices that may be necessary to access the device or data stored on the device, to run software contained on the device, or to conduct a forensic examination of the device;

vii. records of or information about Internet
Protocol addresses used by the device.

4.   As used herein, the terms "records," "information,"
"documents," "programs," "applications," and "materials" include
records, information, documents, programs, applications, and
materials created, modified, or stored in any form, including in
digital form on any digital device and any forensic copies
thereof.

5.   As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
telephone paging devices, beepers, mobile telephones, and smart
phones; digital cameras; gaming consoles (including Sony
PlayStations and Microsoft Xboxes); peripheral input/output
devices, such as keyboards, printers, scanners, plotters,
monitors, and drives intended for removable media; related
communications devices, such as modems, routers, cables, and
connections; storage media, such as hard disk drives, floppy
disks, memory cards, optical disks, and magnetic tapes used to
store digital data (excluding analog tapes such as VHS); and
security devices.

## II. <u>SEARCH PROCEDURE FOR DIGITAL DEVICES</u>

6.    In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed one year from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this one-year period without obtaining an extension of time order from the Court.

b.    The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.    The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the scope of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to

vii

determine, pursuant to the search protocols, whether the data falls within the scope of items to be seized.

ii. The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase," "Griffeye," and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques, including to search for known images of child pornography.

c. The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

d. If the search determines that a digital device does not contain any data falling within the scope of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e. If the search determines that a digital device does contain data falling within the scope of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the scope of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

7.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a

ix

complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

8.    During the execution of this search warrant, law enforcement is permitted to: (1) depress HERRERA-HERNANDEZ's thumb and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of HERRERA-HERNANDEZ's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

9.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

x

## **AFFIDAVIT**

I, Chelsea Malone, being duly sworn, declare and state as
follows:

## I.  **INTRODUCTION**

1.   I am a Special Agent ("SA") with the Federal Bureau of
Investigation ("FBI") and have been so employed since April
2022.  During my employment as an SA, I have conducted and
participated in many investigations of criminal activity,
executed and participated in the execution of search warrants
and arrest warrants, and seized evidence of violations of United
States law.  One of my responsibilities with the FBI includes
investigations into the sexual exploitation of children and
child pornography in the Central District of California, in
violation of 18 U.S.C. § 2251, et seq., among other violations.
I have received training in the investigation and prosecution of
child pornography and child exploitation offenses.  Through my
training and experience, I have become familiar with the methods
used by people who commit offenses involving the sexual
exploitation of children.  My training and experience have given
me an understanding of how people who commit offenses relating
to the sexual exploitation of children use the Internet to
facilitate and commit those offenses.

## II. <u>PURPOSE OF AFFIDAVIT</u>

2.    This affidavit is made in support of an application for warrants to search the premises located at 38562 Dunmore Avenue, Palmdale, California 93550 (the "SUBJECT PREMISES"), as further described in Attachment A-1; and the person of Juan Herrera-Hernandez ("HERRERA-HERNANDEZ"), as further described in Attachment A-2; for violations of 18 U.S.C. §§ 2251(a), (e) (production of child pornography), 18 U.S.C. § 2422(b) (coercion and enticement), 18 U.S.C. § 2252A(a)(2) (receipt of child pornography), and 18 U.S.C. § 2252A(a)(5)(B) (possession of child pornography) (the "Subject Offenses").

3.    As described further in Attachment B, the requested warrants seek authorization to seize evidence, fruits, and instrumentalities of violations of the Subject Offenses from the SUBJECT PREMISES and the person of HERRERA-HERNANDEZ. Attachments A-1, A-2, and B are attached hereto and incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrants and does not purport to set forth all my knowledge of or investigation into this matter. Unless specifically indicated

otherwise, all conversations and statements described in this affidavit are related in substance and in part only, all dates and times are on or about those indicated, and all amounts are approximate.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

5.     As set forth in greater detail below, between approximately May 2024 and December 2024, JUAN HERRERA-HERNANDEZ, utilizing Verizon Wireless phone number 661-618-9483 and social media and messaging applications, engaged in conversations of a sexual nature with a then 13-year-old girl, MINOR VICTIM 1 ("MV1"). During their conversations, HERRERA-HERNANDEZ enticed MV1 to produce Child Sexual Abuse Material ("CSAM") of herself.  HERRERA-HERNANDEZ also threatened to leak MV1's address and/or nude images to others, unless she sent CSAM to him, which she did.  As such, there is probable cause to believe that HERRERA-HERNANDEZ knowingly enticed MV1 to produce child pornography, as well as possessed and received child pornography.

6.     Additionally, based on my training and experience, I know that individuals who engage in the online sexual exploitation of children often maintain communications, records of communications, and sexually explicit depictions of minors on their digital devices even after communications with such minors cease.  Since mobile messaging platforms, such as Apple iMessage

and GroupMe, were used by HERRERA-HERNANDEZ in furtherance of the Subject Offenses, there is probable cause to believe that evidence of the Subject Offenses will be found on HERRERA-HERNANDEZ's digital devices, which are believed to be located on his person and in his residence, the SUBJECT PREMISES.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

7.   The investigation into HERRERA-HERNANDEZ was initiated by the FBI San Antonio Office, Austin Resident Agency.  In May 2025, the investigation was transferred to me at the FBI Los Angeles, Lancaster Resident Agency.  As such, this affidavit is made in part based on my review of reports created by FBI personnel in Austin, as well as my conversations with FBI Special Agent Mark Winters, who was initially assigned the investigation.

### A.   Background of Investigation

8.   Based on my own involvement in this investigation, consultation with other law enforcement officers, review of law enforcement reports, and review of records, I am aware of the following:

a.   On or about December 4, 2024, the parents of MV1, who was then 13 years old, contacted the FBI in Austin, Texas to report that their daughter had sent explicit photos to a then unknown male, later identified as HERRERA-HERNANDEZ, who was believed to be located in California.  MV1's parents also told

FBI personnel that HERRERA-HERNANDEZ had directed MV1 to carve the name "Juan" into her body with a sharp object.

       b.   MV1's parents learned about MV1's communications with HERRERA-HERNANDEZ after observing that MV1 had created multiple Google email accounts, which she used to communicate with HERRERA-HERNANDEZ via Apple iMessage and GroupMe[1]. MV1's parents provided screenshots of these Apple iMessage and GroupMe conversations between MV1 and HERRERA-HERNANDEZ to the FBI. The screenshots showed that HERRERA-HERNANDEZ used Verizon Wireless phone number 661-618-9483 (the "Verizon Number") when messaging with MV1 via iMessage, and display name "…… ……" and unique user ID "121949524" when messaging with MV1 via GroupMe

       c.   On or about December 4, 2024, MV1's parents provided consent for FBI personnel to search MV1's Apple iPhone 11 Pro, MV1's Apple iPad, and an Apple iPhone 14 Pro (belonging to MV1's parents and which had been used to screenshot the images and chats that were exchanged between MV1 and HERRERA-HERNANDEZ).

       d.   On or about December 5, 2024, MV1's parents traveled to a United States Post Office and requested information regarding any packages that had been sent recently by MV1. The United States Postal Service ("USPS") informed

---

[1] GroupMe is an online messaging platform that allows users to send direct, private messages each other.

MV1's parents that MV1 had sent a package to the SUBJECT PREMISES on or about November 16, 2024, which was delivered on or about November 20, 2024.  MV1's parents later learned that this package contained a bracelet that MV1 was sending to HERRERA-HERNANDEZ at the SUBJECT PREMISES.  On or about July 16, 2025, I spoke with MV1's mother, who informed me that she remembered taking MV1 to the post office to mail the bracelet, but did not know, at the time, that it was being sent to HERRERA-HERNANDEZ.

   **B.   Forensic Interview of MV1**

   9.   On or about December 4, 2024, a Child Adolescent Forensic Interview (CAFI) was conducted on MV1 by FBI Forensic Interviewer Janetta Michaela.  Based on my review of law enforcement reports and conversations with FBI SA Mark Winters, I learned that MV1 provided the following information during the interview:

      a.   Several months earlier, MV1 was contacted by an individual whom she came to know as "Juan" (later identified as HERRERA-HERNANDEZ) on X (formerly known as Twitter).  The contact started with a direct message on X from "Juan" that said "Hi."  MV1 could not recall the X usernames utilized by "Juan." MV1 exchanged direct messages on X with "Juan" for several days before the conversation transitioned to GroupMe and Apple iMessage.  "Juan" then threatened to leak MV1's address to

others unless she sent photos of herself.  From there, the conversation transitioned to GroupMe[2].  At "Juan's" request, MV1 sent nude photos of herself to "Juan" via GroupMe.  MV1 stated that she felt loved and that her body was appreciated by "Juan." "Juan" told MV1 that she was pretty and perfect.

      b.   MV1 talked to "Juan" and sent explicit photos of herself to "Juan" almost every day via GroupMe.  MV1 recalled that "Juan's" username was "a bunch of dots".[3]  During this time, on one or two occasions, "Juan" threatened to leak MV1's explicit photos to others.  "Juan" also told MV1 to find and use objects on herself for the purposes of masturbation.  "Juan" sent MV1 one or two videos of himself.

      c.   On one occasion, via GroupMe, "Juan" directed MV1 to carve the name "Juan" into her skin.[4]  MV1 did not believe that "Juan" was the user's real name.  MV1 also referred to "Juan" as "daddy".

---

[2] GroupMe is an online messaging platform, similar to applications like WhatsApp or Signal, that allows users to send direct messages or messages in a group conversation.

[3] Based on the screenshots of conversations that I reviewed, HERRERA-HERNANDEZ's GroupMe display name was "…… ……".

[4] During his review of the digital devices provided by MV1's parents, I learned from SA Winters that he observed a photo, sent from MV1 to HERRERA-HERNANDEZ, depicting what appeared to be the name "Juan" carved into MV1's skin.

### C.    CSAM Sent from MV1 to HERRERA-HERNANDEZ

10.    Based on my conversations with SA Winters and my
review of his reports, I learned that SA Winters reviewed the
contents of the digital devices provided by MV1's parents,
including MV1's iPhone 11 Pro and iPad.  On MV1's digital
devices, SA Winters observed over 500 CSAM and/or child erotica
images sent via Apple iMessage (at the Verizon Wireless Number)
and GroupMe from MV1 to HERRERA-HERNANDEZ.[5]  SA Winters provided
me with the following descriptions of three of these images,
which were consistent with MV1's general appearance and age
(MV1's face was not fully visible in the images):

a.    An image, dated on or about September 1, 2024,
depicting a minor female wearing a black t-shirt with her
pubescent vagina exposed in a lascivious manner.  In the image,
the minor female appears to potentially be engaged in
masturbation.

b.    An image, dated on or about November 27, 2024,
depicting a minor female's buttocks and vagina in a lascivious
manner.

c.    An image, dated on or about December 1, 2024,
depicting a minor female wearing what appears to be a black t-
shirt.  The minor female's shirt is up, exposing one of her

_____

[5] According to SA Winters, some of these images appeared to
be duplicates.

breasts, and exposing the top of her vagina in a lascivious manner.

11.  On July 18, 2025, I was provided with copies of messages and CSAM images exchanged between MV1 and HERRERA-HERNANDEZ via GroupMe.  I reviewed these images and messages and observed numerous CSAM images sent from MV1 to HERRERA-HERNANDEZ, who was utilizing user ID "121949524" and display name "…… ……".

a.  On or about July 17, 2024, two videos were sent from MV1 to HERRERA-HERNANDEZ.  I was unable to watch the actual videos because I only had access to the screenshots of the videos (the screenshots show thumbnails of the videos with a play button over the thumbnails).  The thumbnails depicted MV1 with what appears to be a pink vibrator touching her vagina.

b.  On or about July 27, 2024, two videos were sent from MV1 to HERRERA-HERNANDEZ. I was unable to watch the actual videos because I only had access to the screenshots of the videos (the screenshots show thumbnails of the videos with a play button over the thumbnails).  The thumbnails depicted MV1 with what appears to be a vibrator touching her genitalia.  In the first thumbnail, the vibrator is a white/grey color.  In the second thumbnail, MV1 appears to be using the same pink vibrator as described in the paragraph above.

**D.    Review of Messages between MV1 and HERRERA-HERNANDEZ**

12.  Based on my conversations with SA Winters and my review of his reports, I learned that SA Winters conducted a review of Apple iMessages between MV1 and HERRERA-HERNANDEZ (using the Verizon Wireless Number) and GroupMe messages between MV1 and HERRERA-HERNANDEZ that were either: (1) screenshotted by MV1's parents; or (2) forensically extracted from MV1's digital devices.  SA Winters and/or I observed the following iMessage and GroupMe conversations between MV1 and HERRERA-HERNANDEZ, among others, which were dated between May 2024 and December 2024.

a.    In or around May 2024, HERRERA-HERNANDEZ messaged MV1 via GroupMe: "*I can't wait until you are an adult so I can sexually exploit you for money.*"  I believe that this message shows that HERRERA-HERNANDEZ knew that MV1 was a minor.

b.    In or around May 2024, via iMessage, HERRERA-HERNANDEZ (noted as "H-H") asked MV1 to find a friend for HERRERA-HERNANDEZ for the purposes of sexual gratification.  The following is an excerpt from that conversation:

H-H: HIII

H-H: my pretty girl I have a really weird question >_<

MV1: what is it :3

H-H: Would one of your friends be ok with helping me cum while your gone. . . .

MV1: idk :0

MV1: you might have to ask around :3

H-H: I want you to do it cuz it's hotter that way :3

H-H: Are you mad at me

    c.   After the above conversation, HERRERA-HERNANDEZ continued to ask MV1 about finding a friend. On or about May 8, 2024, through iMessage, HERRERA-HERNANDEZ and MV1 engaged in the following conversation:

MV1: I FORGET SOMETIMES

H-H: You won't forget when I forcefully take your virginity I'll use your tears as lube :3

H-H: Which friend should I dm :)

H-H: You choose :3

MV1: i can't think of any that aren't minors :,o

H-H: your lucky on this one -_-

    d.   MV1's parents informed the FBI that HERRERA-HERNANDEZ contacted a number of MV1's friends after being told by MV1 that they were minors. On or about July 16, 2025, I spoke with MV1's parents, who told me that after they contacted law enforcement and MV1 stopped communicating with HERRERA-HERNANDEZ, HERRERA-HERNANDEZ began contacting MV1's minor friends in an attempt to regain contact with MV1. MV1's parents learned this from the parents of MV1's friends.

e.    In or around May 2024, through GroupMe, HERRERA-HERNANDEZ and MV1 discussed self-harm, as described in the conversation below:

H-H: If you wanna to get ungrounded I better see you naked on your hands knees and begging for my forgiveness you slapping your self as hard as possible and carving initials

H-H: On your tummy with a heart :)

f.    In or around May 2024, through GroupMe, MV1 sent HERRERA-HERNANDEZ a picture of what appears to be her left hip with the name "JUAN" cut into her skin.

g.    On or about May 12, 2024, through GroupMe, HERRERA-HERNANDEZ and MV1 again messaged about self harm. Specifically, HERRERA-HERNANDEZ messaged MV1, "Prove it" and "*Cut my "Juan's property" with a big heart around it on your thigh :3.*" Following that message, MV1 sent HERRERA-HERNANDEZ a picture of what appeared to be her left thigh with multiple lacerations visible and part of the name "Juan" visible. HERRERA-HERNANDEZ then responded, "HEGE I OWN you :3."

**E.    Identification of JUAN HERRERA-HERNANDEZ**

13.    I am aware of the following based on my personal investigation, my review of reports written by other law enforcement officers, and my conversations with FBI SA Mark Winters:

a.    MV1's parents indicated that they believed that
HERRERA-HERNANDEZ's residence was 38562 Dunmore Avenue,
Palmdale, California, 93550 (i.e., the SUBJECT PREMISES), based
on the package (containing the bracelet) that MV1 had sent to
the SUBJECT PREMISES.

b.    MV1's parents also observed on MV1's digital
devices that HERRERA-HERNANDEZ had sent his location data to MV1
via iMessage, which indicated that HERRERA-HERNANDEZ was located
at the SUBJECT PREMISES.

c.    On or about July 16, 2025, I spoke with MV1's
parents, who informed me that they observed photos that HERRERA-
HERNANDEZ sent to MV1 via iMessage on MV1's digital devices.
One of those photos appears to depict the front yard of the
SUBJECT PREMISES (the "yard photo").  MV1's parents looked up
the address of the SUBJECT PREMISES on Google Maps, which they
obtained from the location data that HERRERA-HERNANDEZ had
previously sent to MV1 via iMessage.  MV1's father then compared
the yard photo and the Google Maps image, and annotated the
photos with notes that detailed points of overlap, such as the
fence, fence poles, rocks, and sidewalk.  Both of these photos
are copied below.  The first photo is the yard photo.  The
second photo is the image from Google Maps.





d.    On or about May 14, 2025, while conducting surveillance at the SUBJECT PREMISES, I observed a white SUV parked outside of the SUBJECT PREMISES that appeared to be the same SUV depicted in the yard photo.

e.    On or about July 16, 2025, and July 17, 2025, while conducting surveillance at the SUBJECT PREMISES, I observed dogs in the front yard of the SUBJECT PREMISES that appear to be the same dogs depicted in the yard photo.

f.    On or about July 14, 2025, I obtained records from the California DMV regarding HERRERA-HERANDNEZ.  Those records indicated that HERRERA-HERNANDEZ's registered address was the SUBJECT PREMISES.

g.    Several photos of HERRERA-HERNANDEZ were recovered from MV1's Apple iPhone 11 Pro.  Two of these photos are displayed below next to HERRERA-HERNANDEZ's California DMV photo.

| Photo of HERRERA-HERNANDEZ found on MV1's digital device | Photo of HERRERA-HERNANDEZ found on MV1's digital device | DMV Photo of HERRERA-HERNANDEZ |
|---|---|---|
|  |  |  |

h.   On July 17, 2025, I spoke with MV1's father and provided him with the three photos of HERRERA-HERNANDEZ that are copied above.  MV1's father reviewed the three images and indicated that he had also seen images of the same individual (i.e., HERRERA-HERNANDEZ) in iMessages that HERRERA-HERNANDEZ had sent to MV1.

i.   A second victim ("Minor Victim 2" or "MV2") reported to the FBI that she was contacted by HERRERA-HERNANDEZ after MV1's parents began to scrutinize MV1's digital devices. MV2 believed that HERRERA-HERNANDEZ was MV1's boyfriend, and that he was approximately the same age as MV1.  MV2 also

indicated that for approximately three to four days, MV2 helped MV1 communicate with HERRERA-HERNANDEZ via iMessage.

j.    On or about December 2, 2024, HERRERA-HERNANDEZ sent MV2 the following screenshot of a conversation he had with MV1:

> H-H: *What's his government name* [in reference to a photo of a dog]
>
> MV1: *Peter barker*
>
> H-H: *what's my government name*
>
> MV1: *Baby puppy can't remember that*
>
> H-H: *What's my address*
>
> MV1: *38562 Dunmore Avenue in Palmdale, California*
>
> H-H: *still skeptical*

k.    During a review of MV1's iPhone 11 Pro, SA Winters observed that the name "JUAN HERRERA-HERNANDEZ" appeared several times.  For example, the contact name for the Verizon Number was listed in MV1's iPhone 11 Pro as "My Husband"; however, MV1's iPhone prompted her several times to update the contact name to "Juan Herrera-Hernandez" (see image below). Based on my training and experience, I know that Apple iPhones have the option to replace a contact's information with updated information and an example of that can be seen in the image below, which is from MV1's iPhone:

17



l.    During his review of MV1's iPhone 11 Pro, SA
Winters also observed that HERRERA-HERNANDEZ, using the Verizon
Number, had sent MV1 numerous pictures that were "HEIC" files,
which is the default file type used by Apple iPhones when an
image is created using an iphone camera.  One such photo sent by
HERRERA-HERNANDEZ to MV1 depicted a small, white puppy, and
appeared to have been created by an iPhone 14 camera.  That
specific image also included the following GPS coordinates for
the location where the photograph was taken: *34.58364444444445*,
*-118.06813055555556*.  When these coordinates are entered into a
mapping service, such as Google Maps, they resolve directly to
the SUBJECT PREMISES, as shown below.



m.    FBI analysts conducted checks of social media, a California DMV database, and the National Crime Information Center, which identified several likely relatives of HERRERA-HERNANDEZ, all of whom shared his same address, i.e., the SUBJECT PREMISES.  A review of Facebook posts from HERRERA-HERANDEZ's father indicated that the family had celebrated HERRERA-HERNANDEZ's 18th birthday on June 2, 2024.[6]

n.    On or about April 7, 2025, an Administrative Subpoena was served on Verizon Wireless regarding phone number

---

[6] Based on my review of California DMV records, I learned that HERRERA-HERNANDEZ's date of birth is June 2, 2006.

661-618-9483 (i.e., the Verizon Number that HERRERA-HERNANDEZ
used to exchange iMessages with MV1).  On or about May 2, 2025,
Verizon provided a response to the subpoena, but was unable to
provide the subscriber's name or address.  However, Verizon did
indicate that one of the devices that was connected to the
Verizon Number was an Apple iPhone 14.  The photo that HERRERA-
HERNANDEZ sent to MV1 of the small, white puppy (described
above) was taken with an Apple iPhone 14.

     **F.**    **HERRERA-HERANDEZ Still Resides at the SUBJECT PREMISES**

    14.  On or about May 14, 2025, I conducted physical
surveillance at the SUBJECT PREMISES and observed a white Nissan
SUV bearing California license plate 8JMG021 in front of the
SUBJECT PREMISES.  Based on my review of California DMV records,
I learned that the SUV is registered to M.H. or J.H., who appear
to be HERRERA-HERANDEZ's parents.  I also learned that the SUV
is registered to the SUBJECT PREMISES.  As previously noted, the
SUV that I observed appears to be the same SUV that was parked
outside of the SUBJECT PREMISES in the photograph sent from
HERRERA-HERNANDEZ to MV1.

    15.  On or about July 14, 2025, I obtained and reviewed
records from the California DMV for HERRERA-HERNANDEZ and
learned that HERRERA-HERNANDEZ's address is still listed as the
SUBJECT PREMISES.

16.   On or about July 14, 2025, FBI SA's Barrett Hand and
Michaela Dotson conducted physical surveillance at the SUBJECT
PREMISES.   Prior to the surveillance, SA Hand and SA Dotson were
provided with a photograph of HERRERA-HERNANDEZ to review.   At
approximately 2:30 PM, SA Hand observed a Hispanic male who
appeared to be HERRERA-HERNANDEZ walking outside the residence
with a dog.   Photos taken by SA Hand are copied below:

 

**G.    HERRERA-HERNANDEZ May Have Access to Children Through His Employment**

17.  On or about July 14, 2025, while reviewing law enforcement records for HERRERA-HERNANDEZ, I observed that in or around 2024, HERRERA-HERNANDEZ applied to work at a day care center.

18.  I then conducted open-source database checks and observed a Linkedin profile page for "JUAN HERRERA," which indicated that he works maintenance at the Pure and Simple Academy.  Based on open-source database checks, I learned that Pure and Simple Academy is a school in Lancaster, California that provides services to children with special needs.



**Juan Herrera**

Maintenance at Pure and simple academy

Palmdale, California, United States · Contact Info

## V.  BACKGROUND ON CHILD EXPLOITATION OFFENSES AND THE USE OF COMPUTERS TO PERPETRATE SUCH OFFENSES

19.  Based upon my training and experience in the investigation of child pornography, and information relayed to me by other law enforcement personnel involved in the investigation of child pornography offenses generally, I know the following information about the use of computers and child pornography:

20.  Computers and computer technology have revolutionized the way in which child pornography is produced, distributed, and utilized.  Child pornographers can now produce both still and moving images directly from a common video camera and can scan these images into computer-readable formats.  The use of digital technology has enabled child pornographers to electronically receive, distribute, and possess large numbers of child exploitation images and videos with other Internet users worldwide.

21.  Computer users can choose their method of storing files: either on a computer's hard drive, an external hard drive, a memory card, a USB thumb drive, a smart phone or other digital media device, etc. (i.e., "locally") or on Cloud Storage.  Computer users frequently transfer files from one location to another, or from one digital or storage device to another, such as from a phone to a computer or from Cloud Storage to an external hard drive.  Computer and digital device

23

users also often create "backup," or duplicate, copies of their
files.  In this way, digital child pornography is extremely
mobile and such digital files are easily reproduced,
transported, and stored.  For example, with the click of a
button, someone trading images and videos containing child
pornography with others through an online instant messaging
application can copy and transfer the images and videos onto
other digital devices or media storage devices such as external
hard drives small enough to fit onto a keychain.  Just as
easily, these files can be copied onto compact disks and/or
stored on mobile digital devices, such as smart phones and
tablets.  Furthermore, even if the actual child pornography
files are stored in Cloud Storage, files stored in this manner
can only be accessed via a digital device.  Therefore, viewing
this child pornography would require a computer, smartphone,
tablet, or some other digital device that allows the user to
access and view files on the Internet.

## VI. <u>TRAINING AND EXPERIENCE ON INDIVIDUALS WITH A SEXUAL INTEREST IN CHILDREN</u>

22.  Based on my training and experience, and the training
and experience of other law enforcement officers with whom I
have had discussions, I have learned that individuals who view
and possess child pornography are often individuals who have a

sexual interest in children and in images of children, and that there are certain characteristics common to such individuals:

a.   Individuals who have a sexual interest in children or images of children may receive sexual gratification, stimulation, and satisfaction from contact with children; or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or in other visual media, or from literature describing such activity.  These individuals often maintain possession of these items for long periods of time and keep their collections in numerous places – in digital devices in their homes, in their cars, in their workplaces, or on their persons.

b.   Individuals who have a sexual interest in children or images of children also may correspond with and/or meet others to share information and materials (including through digital distribution via the Internet); conceal such correspondence as they do their sexually explicit material; and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.  These individuals often maintain possession of these items for long periods of time.

23.    Digital child pornography on a digital device is easy to maintain for long periods of time.  Modern digital devices often have extremely large storage capacities.  Furthermore, cheap and readily available storage devices, such as thumb drives, external hard drives, and compact discs make it simple for individuals with a sexual interest in children to download child pornography from the Internet and save it – simply and securely – so it can be accessed or viewed indefinitely.

24.    Furthermore, even if a person deleted any images of child pornography that may have been possessed or distributed, there is still probable cause to believe that there will be evidence of the illegal activities – that is, the possession, receipt, and/or distribution of child pornography – at the SUBJECT PREMISES or on his person.  Based on my training and experience, as well as my conversations with digital forensic experts, I know that remnants of such files can be recovered months or years after they have been deleted from a computer device.  Evidence that child pornography files were downloaded and viewed can also be recovered, even after the files themselves have been deleted, using forensic tools.  Because remnants of the possession, distribution, and viewing of child pornography is recoverable after long periods of time, searching the SUBJECT PREMISES could lead to evidence of the child exploitation offenses.

## VII. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>[7]

25. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of

---

[7] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

28

26.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

e.  Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

f.  Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

27.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

29

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress HERRERA-HERNANDEZ's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of

30

HERRERA-HERNANDEZ's face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

28.    Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VIII.    <u>CONCLUSION</u>

29.    For all the reasons described above, there is probable cause to believe to believe that evidence, fruits, and instrumentalities of violations of the Subject Offenses, as described in Attachment B, will be found in a search of the Subject Premises and the person of HERRERA-HERNANDEZ.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 18th day of
July, 2025.

_____
HONORABLE A. JOEL RICHLIN
UNITED STATES MAGISTRATE JUDGE